IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**JAMES A. HAYES, III,**                    Case No. 3:15 CV 153

      Petitioner,                    Judge Patricia A. Gaughan

      v.                    Magistrate Judge James R. Knepp, II

**JASON BUNTING,**

      Respondent.                    REPORT AND RECOMENDATION

### INTRODUCTION

*Pro se* Petitioner James A. Hayes, III ("Petitioner"), a prisoner in state custody, filed a petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition") (Doc. 1). Respondent Jason Bunting ("Respondent") filed a return of writ (Doc. 8) and supplemental transcripts (Doc. 9). The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated February 6, 2015). Following review, the undersigned recommends the Court deny the Petition.

### FACTUAL BACKGROUND

For the purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, erroneous factual findings by the state court. § 2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of

appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. In this case, Ohio's Third

District Court of Appeals set forth the following findings of fact:

> {¶2} On September 12, 2012, the Seneca County Grand Jury indicted Hayes on two counts. Both counts alleged that Hayes had committed felonious assault, felonies of the second degree. On September 19, 2012, Hayes entered a plea of not guilty to both counts.

> {¶3} Between February 25 and February 28, 2013, a jury trial was held. At trial, the State presented the testimony of seventeen witnesses and Hayes presented the testimony of two witnesses. The first witness for the State was Ohio State Trooper Anthony Scherley ("Scherley"). Scherley testified that on February 19, 2012, he stopped a white minivan after it pulled out in front of him from a private drive. When he approached the driver, he observed blood on the driver as well as on the van. Scherley then called for an ambulance. The driver was Brian Armbruster ("Armbruster") and there was a passenger in the vehicle who was identified as Roger Seifert ("Seifert"). Scherley learned that Armbruster and Seifert had earlier been in a fight at a bar and that Armbruster had been stabbed during it. The investigation was turned over to the Tiffin Police Department and Armbruster was transported from the scene by ambulance.

> {¶4} The next witness for the State was Tiffin Police Officer Brent Riley ("Riley"). Riley testified that he was sent to Stiney's Three Oaks Bar ("Three Oaks") in Tiffin, Seneca County, Ohio, to investigate a stabbing. He was sent to check the parking lot for signs of evidence and he located some blood droplets. A second officer at the scene found a small knife in the grass near the parking lot. Later in that shift, he was sent to investigate a car crash in which he was informed the suspect for the stabbing might have been involved. At the scene, Riley observed blood on the red car and saw a red t-shirt inside the car with blood on it. The passenger in the red car was Hayes. The driver of the vehicle was Staci Hayes ("Staci"), Hayes' wife. While at the scene, Riley overheard Hayes tell the EMT's that he had been injured in a fight at a bar and that he wished to go to the hospital. Hayes was then transported by the ambulance to the hospital. The damaged vehicle was then towed to the Parks Department and placed in a secured garage. Armbruster's minivan was also there.

> {¶5} Seneca County Sheriff's Deputy Matthew Huffman ("Huffman") testified next for the State. Huffman testified that he responded to an accident call between a red Pontiac Grand Prix and a bronze Ford Focus. From the statements at the scene and the physical evidence, it appeared that Staci had been driving. As Huffman approached the vehicle, he saw blood on Hayes and Staci. Both Staci and Hayes stated that the blood was from injuries received when Hayes "got jumped in a bar fight." Inside the vehicle, Huffman saw a white t-shirt with blood on it. Knowing of the stabbing at the Three Oaks earlier, Huffman questioned whether it was related. Huffman then contacted the Tiffin Police Department.

Huffman then turned over the investigation to Riley and Lietenant [sic] Michelle Craig ("Craig"), while Huffman completed the accident report.

{¶6} The fourth witness for the State was Detective Shawn Vallery ("Vallery") of the Tiffin Police Department. Vallery was the on-call detective assigned to investigate the stabbing at Three Oaks. He learned that the victim was Armbruster. Upon learning that Armbruster was being taken to the emergency room, Vallery went there to speak with him. At the hospital, Vallery observed scrapes to Armbruster's knees, a mark on his left cheek and forehead, and blood on a bandage on the left side of his torso. After taking photographs of the injuries, Vallery collected Armbruster's clothing. While at the hospital, Vallery learned about the accident and that Staci and Hayes were coming into the hospital where Vallery was located. Craig collected the clothing from Staci and Hayes. Vallery then identified the photographs of the clothing. Specifically, Vallery identified Exhibits 11 and 12 as photographs of a jacket recovered from Seifert. Exhibit 11 shows that there is a defect in the jacket.

{¶7} After leaving the hospital, Vallery went to Three Oaks to retrieve a copy of the video recording. Upon arriving back at the police station, Vallery learned that Hayes was in critical condition and was having emergency surgery. Vallery later interviewed various occupants of the bar, the bartender, and Seifert. He also requested a warrant to search the vehicle. Some of the evidence was sent to BCII for testing. Vallery was able to identify the knife found at the scene, and testified that it had been sent to BCII for testing. Vallery also testified that the jacket worn by Seifert on the night in question was Exihibit [sic] 38 and that he submitted it to BCII.

{¶8} On cross-examination, Vallery testified that he did not speak to Seifert until the next day. When Seifert came to the station, he was not tested for alcohol consumption. Vallery testified that he saw no need to test Seifert as he assumed that he had been drinking the night before since he was at the bar. Vallery questioned Seifert because he was unsure who had started the fight. Vallery admitted that during his investigation, he heard various stories and some statements were contradictory. One of the people he questioned mentioned there was a gun, but no gun was found. Vallery also admitted that he used to work for Armbruster for a couple of years and that he knew him "pretty well." Armbruster does like to drink and is not afraid to speak his mind. When questioned by Vallery, Armbruster stated that he had been drinking. At the initial questioning of Armbruster, Vallery noticed there was blood on the shirt and jeans that Armbruster was wearing. Armbruster also identified a camouflage shirt, which was found in Hayes' vehicle, as a shirt he was wearing that night. When speaking with Armbruster at the emergency room, Vallery noticed that Armbruster was in pain and that he had been drinking.

{¶9} The next witness for the State was Detective Charles Boyer ("Boyer") of the Tiffin Police Department. Boyer testified that after delegating evidence collecting duties, he went to Three Oaks to process the scene. When he arrived at Three Oaks, the scene was already taped off. Boyer reviewed the scene in the taped off

3

area and also checked the area outside of the tape to insure that nothing was missed. Inside the taped off area, Boyer found two hats, an open-blade knife, a Pepsi, a $10 bill, and blood splatter in seven different locations. Boyer then photographed the entire area, including around the bar. Boyer identified Exhibits 43 through 58 as the photos he took at Three Oaks. The next day, Boyer assisted Vallery in procuring search warrants for the vehicles which were secured. Once the warrants were obtained, Boyer participated in searching the two vehicles. Boyer identified Exhibits 59-67 as photographs taken of the vehicles on February 20, 2012, pursuant to the search warrant.

{¶10} The sixth witness for the state was Sergeant Robert Bour ("Bour") of the Tiffin Police Department. Bour testified that he was called in from home to help investigate the stabbing at Three Oaks. When he arrived at Three Oaks, he was updated as to the status of the victim and his injuries, how the victim came to be known and that the alleged suspect's vehicle had been in a crash resulting in the suspect and his wife being transported to the emergency room. Bour then went to the scene of the traffic stop of the victim. When he arrived, he inspected the vehicle and "saw lots of blood." There was blood under the driver's seat, on the steering wheel, and on the outer door handle. There also appeared to be fresh damage to the right front of the vehicle. Bour identified Exhibits 70 and 71 as photos he took at the scene. Once he had taken the photographs, Bour arranged to have the vehicle towed to the Parks Department and secured. Bour then returned to Three Oaks to assist Boyer. The next day, Bour assisted Boyer in searching the vehicles. Out of the red vehicle, they collected a long sleeve, torn, bloody camouflage shirt. On cross-examination, Bour testified that Armbruster was traveling away from the hospital when he was stopped. Bour also admitted that he interviewed others who had been in the bar, but not until several days if not weeks had passed.

{¶11} Next, Carrie Robenalt ("Robenalt") testified for the State. Robenalt was the bartender at Three Oaks on February 19, 2012. She is familiar with Armbruster and testified that he was in the bar that evening seated near the back door. Seifert was also there and was standing near Armbruster. Robenalt testified that neither Armbruster nor Seifert were involved with any arguments or confrontations with anyone. She testified that a man and a woman got into an argument near the bathrooms that night because she was engaging in conduct he did not like. At the time, she did not know who they were, but later learned that the man was Hayes and the woman was Staci. Robenalt testified that Hayes was dressed all in black and that Staci was wearing a white shirt. When they left the bar, they were arguing. Both Hayes and Staci were very intoxicated. Although she did not know what they were saying she could tell they were arguing. They left out the back door. Armbruster and Seifert were still in the bar when Hayes and Staci left, and did not leave for at least a half hour. Later, Hayes and Staci came back inside with blood all over them and Staci was upset. Hayes had his right hand wrapped in a rag with blood dripping from it. When people started asking questions, Hayes grabbed Staci's hand and told her they had to leave. Hayes then dragged Staci

4

down the hall and they left through the back door. Other patrons followed them out. Soon after that, the police arrived.

{¶12} On cross-examination, Robenalt testified that earlier in the evening Seifert and another customer got into an argument and she threw out the other customer. She admitted that she had told Vallery that Seifert was angry and wanted to fight with the other customer, however it was normal for the other customer to cause problems. She testified that on the night of the incident, Three Oaks was very busy and it was standing room only. There was karaoke occurring in the bar that night and it was loud. That night, she was working at the bar and did not leave her station. Robenalt was frustrated that night because they were very busy and the only other person working was a trainee. Up until the argument between Hayes and Staci, they did not cause any disturbance. Robenalt testified that Armbruster and Seifert were drunk, but were not "trashed."

{¶13} On re-direct examination, Robenalt testified that Hayes and Staci had also been drinking. She testified that Staci was "really drunk" and was bouncing off walls and bumping into people. Hayes was also drunk as she was serving him "double 77's." On recross-examination, Robenalt testified that she served Armbruster and Seifert Bud Light.

{¶14} The next witness for the State was one of the victims, Armbruster. Armbruster testified that he and Seifert went from a gun raffle to a friend's home and then to Three Oaks. Armbruster testified that he drove his minivan. He parked the van in the back lot, locked the vehicle, and entered the bar through the back entrance. Armbruster testified that he and Seifert sat down at the end of the bar, but he knew some of the other people who were there. He did not have any arguments or fights with anyone inside the bar that night. When he and Seifert got up to leave, it was not closing time yet. They walked out the back door with the intention of getting the rest of the beer out of the van and walking to Seifert's home. Armbruster testified that as they were walking to the car, they saw Hayes pushing a woman around and they were screaming at each other. Armbruster continued to the van and when he reached it, he turned around to see Seifert and Hayes arguing, but not fighting yet. Armbruster then approached to try and break it up, and "a girl" jumped on his back. Armbruster then tried to get her off the back. At that time, Seifert and Hayes were fighting as well. After getting the girl off his back, he again went toward Seifert and Hayes to try and break up the fight, and the girl jumped on his back again. He again knocked her off of his back and went towards the fighting duo. When he got there, he felt a stabbing and the rush of blood coming out of him. Armbruster did not see the knife. Armbruster then went back to the van, unlocked it, and got in. As he started it, Seifert got into the passenger side, and Armbruster put the van into gear and attempted to exit. Hayes then started pounding on the windows and kicking the van until he dented it. Armbruster was just trying to get away, so he pulled out of the parking lot and turned right. Within a quarter of a mile, the police had stopped him, and approached the van. When the officer shined the flashlight into the van, he showed him that he was covered in blood. The night of the incident, Armbruster

5

was wearing a camouflage hat, a camouflage shirt, a t-shirt, blue jeans, and tennis shoes. During the scuffle with the woman, he lost his hat and his camouflage shirt.

{¶15} The next thing Armbruster remembers was waking up on life support in Toledo. Armbruster testified that he was on life support for two days and in the Intensive Care Unit for seven to ten days. As a result of the stabbing, he had lost 65% of his blood and had to have transfusions. In addition, his left lung collapsed and the doctors had to perform major surgery to relieve the pressure from the internal bleeding. Armbruster testified that he was stabbed one time in his left side. His lung will never "come back" and he has had to have reconstructive surgery to fix a problem with his stomach. A year after the incident, Armbruster still was having problems due to the stabbing. Armbruster did not know who his attacker was and had not spoken with him previously.

{¶16} On cross-examination, Armbruster testified that he had three cans of beer to drink at the gun raffle. At Three Oaks, Armbruster drank two more beers. He might have had a single beer in the car between leaving the raffle and going to the bar. His blood alcohol level was above the legal limit. Armbruster testified that although he did not know who had stabbed him, there were only three people there and he knew it was not Seifert. On redirect examination, Armbruster identified Exhibit 26, the camouflage shirt found in Hayes' vehicle, as the shirt he was wearing the night he was stabbed.

{¶17} The ninth witness for the State was the second victim, Seifert. Seifert testified that he, Armbruster, and another friend went to Bettsville around 6:00 p.m. on February 18, 2012. When they left, they took the friend home and then he and Armbruster went to Three Oaks. Armbruster was driving. Armbruster then parked at the back of the lot and they entered the bar through the rear entrance. Seifert denied that either he or Armbruster argued or fought with anyone inside the bar that night. When they left the bar, they went out the back door and he heard a man and woman arguing. Seifert testified that he told the man to "leave her alone" and the man charged him. He knew the man was Hayes because he had gone to school with him. Hayes pushed him and they ended up "wrestling around on the ground." Armbruster was approximately ten feet away and the girl was on his back. The fight ended when Seifert, who was on top of Hayes, let Hayes up. When they stood up, he saw Hayes pull something shiny out of his pocket and stab Armbruster with it. Armbruster was stabbed on his left side. Seifert did not recall what happened between the stabbing and trying to get into the van. Seifert remembered that once they were in the van, Hayes began hitting it and kicking at it while trying to get in. They then pulled out of the parking lot to get away but Seifert did not know where they were headed. Almost immediately upon leaving the parking lot, they were pulled over. Once stopped, the patrolman came up with his flashlight and Seifert saw all the blood. Armbruster was quickly transported by ambulance. A friend of Seifert's came to get him.

{¶18} On cross-examination Seifert testified that he only lived two blocks away from Three Oaks. The police would not let him leave the scene to walk home, but

6

insisted that someone come and get him. Seifert admitted that he drank "approximately a 12 pack" that night. Seifert testified that he gave a statement to the officers at the traffic stop. However, he was unable to testify to how long he was at the stop or any other details concerning the stabbing. Bour came to Seifert's home the next day to collect the clothing that Seifert had been wearing the previous night. Seifert also testified that during the fight with Hayes, they were both on the ground, Seifert on top, and he was hitting the top of Hayes' head. On redirect, Seifert testified that Hayes pulled the knife out and stabbed Armbruster after the fight was over.

{¶19} For their tenth witness, the State called Melissa Lovas ("Lovas"). Lovas testified that she had known Hayes for a couple of years. She testified that at the time of the incident, she was at Three Oaks. She did not notice any fights or arguments inside the bar that evening. She saw Hayes and Staci sitting at a table in the back with another couple. At some point in time, she saw Staci come in the back door with her hands bleeding and wrapped in a shirt. A couple seconds later, Hayes came in asking for help. Lovas went outside with Staci and Hayes went to get the car. When Staci got into the car, Hayes got out of it and started punching a white van. Hayes then looked at Staci and "told her to grab the gun." Lovas then went back into the bar. Lovas admitted on cross-examination that she did not see a gun and did not hear any gun shots. As she was getting ready to leave, the police arrived.

{¶20} The next witness for the State was Cory Hess ("Hess"). Hess was a customer at the Three Oaks the night of the incident. Hess is an acquaintance of Armbruster and testified that Armbruster was wearing a camouflage shirt and a ball cap that night. Hess is also an acquaintance of Seifert. The night of the incident he saw a man and woman arguing. Hess did not know them, but the man was dressed all in black, except for white tennis shoes. The woman appeared to be very intoxicated, but the man appeared to be "like a normal person".

{¶21} Vernon Hites ("Hites") was the twelfth witness for the State. Hites testified that he got to Three Oaks at around 2:00 a.m. the night of the incident. He and his friends entered through the front door. As he was the designated driver, he was only drinking soda. Hites testified that he did not see any fights that evening, but as a result of a conversation about a fight, he went looking for his son in the back hall. He then went out the back door into the parking lot where he saw a man arguing with a woman, and pushing her towards a red Grand Prix. The man was screaming at the woman to get in the car. Hites then returned to the bar and soon afterwards, the police arrived. On cross-examination, Hites testified that he knows Armbruster, but did not see him in the bar. Hites did not know Seifert or Hayes.

{¶22} The next witness was Mark Lang ("Lang"), who was a customer at Three Oaks on the night of the incident. Lang testified that he knows Armbruster and he knows Hayes. When he left around midnight, both Hayes and Armbruster were both still there. On February 19, 2012, Lang opened the bar at 6:30 a.m. as the bartender. Hayes came in between 7:00 and 8:00 a.m. Lang testified that Hayes

stated that he hoped Armbruster was "hurt bad and in pain after the three guys jumped me last night." Lang then told Hayes to leave.

{¶23} For its fourteenth witness, the State presented Lieutenant Michelle Craig ("Craig") of the Tiffin Police Department. Craig testified that she went to the crash site where Hayes and Staci were. When she arrived, the ambulance with Staci was leaving, but Hayes was still at the scene. Hayes was dressed all in in black. Hayes had a bloody nose and said he was sore, so he was transported to the hospital as well. At the scene, she observed a cloth that appeared to be bloody behind the driver's seat of Hayes' car. Craig identified Exhibit 75 as a photograph of the bloody cloth taken through the window.

{¶24} After the scene of the crash, Craig went to the hospital. At the hospital, Craig spoke with Hayes. Craig testified that she has known Hayes for a long time and that he was intoxicated. Craig observed some small pin-sized spots that had been bleeding on his left side. She also saw where the top layer of skin on the inner side of Hayes' right hand had been scraped off. She notice[d] that there was blood on Hayes' hands and all over his clothing. In addition to taking photographs of Hayes, she collected his clothing and collected swabbings from his hands. Exhibit 77 was identified as a photograph of Hayes' right side of his head, which he claimed was hit with a brick, though the injuries did not appear to support that claim. Craig also identified Exhibit 78 as a photograph showing the left side of Hayes' face and some small cuts. At the hospital, Hayes told Craig that when he and Staci were leaving Three Oaks, "three guys came and started hitting him or booting him, kicking him, thumping him." Craig testified that Hayes was unsure whether it was three, four, five, or six men. Hayes described the men as white males in their 30's and was unable to provide any other details or give an explanation as to why it happened. Hayes repeatedly stated that he was getting beat or stomped, but would also say that he was not really hurt. When asked about the knife, Hayes claimed he only had a pocket knife, but it was not in his pockets when checked. Hayes described the knife he had as "all black." The injuries claimed by Hayes did not match up with the injuries observed by Craig. Hayes claims the fight ended when he got away and got into the car. Hayes told Craig that he had not gone back into the bar.

{¶25} In addition to speaking with Hayes, Craig also had the opportunity to question Staci. Staci claimed that her elbow was damaged when she was thrown to the ground after jumping on someone after the fight. Craig collected her clothing as well.

{¶26} On February 21, 2012, Craig spoke with Hayes again. Hayes told her that when he and Staci left Three Oaks, he was attacked by three men in the parking lot. The men started kicking him and hitting him. Hayes claimed that his hand got cut when he reached down to prevent his assailants from getting his knife, only to discover that it was open. When Craig asked Hayes if he knew Seifert or Armbruster, he denied that he did. Hayes was unable to explain how Armbruster's shirt got into his car. Craig also testified that she contacted Staci to have her look at a photo lineup, but Staci never came in to do so. When they came in for

questioning, Craig took DNA samples of Staci and Hayes pursuant to a search warrant. Craig also questioned Hayes as to why he had not called the police about the attack. Hayes told her he wanted to "assess the situation first" because he was not really harmed. Hayes admitted that he saw the police officer that had pulled Armbruster over when he left, but did not go over to the officer to report the attack.

{¶27} On cross-examination, Craig testified that the blood samples taken from Hayes' hands were not tested. Craig admitted that Hayes' claim that he was attacked was consistent and had not changed. When questioned about the kind of shoes that were "stomping" him in the face, Hayes repeatedly identified them as boots. At the hospital, Craig went back and forth between Staci and Hayes when asking questions. One of the injuries sustained by Hayes at some point in time, whether during the fight or the subsequent accident was a dislocated nose.

{¶28} On redirect, Craig testified that Hayes was a suspect in the stabbing because he matched the description and had a lot of blood on him that was not from the accident. Craig also testified that they did not send the samples from Hayes' hands because BCII refuses to test more than five pieces of biological evidence. When questioned about the stabbing, Hayes told Craig that "if somebody got stabbed because of him and his wife, he was glad."

{¶29} The next witness for the State was Ted Manasian ("Manasian"), a forensic scientist at BCII. Manasian testified that he is an expert in fiber analysis, and was declared such by the trial court. In this case, Manasian was asked to examine defects in clothing to determine whether it was caused by cutting or tearing. The items submitted for testing included the knife, the fibers found on the knife, the camouflage shirt identified as belonging to Armbruster, the sweat jacket identified as belonging to Seifert, and a t-shirt identified as belonging to Armbruster. Manasian testified that he found numerous fibers on the knife blade. The fibers on the knife did not match those from the white tank top, but there were fibers from the sweat shirt found on the knife. There were also additional fibers present that were inconsistent with the two articles of clothing submitted. Although the "defect" found in the camouflage shirt was not analyzed to determine if it was a cut or a tear, it was noted that its position was consistent with the position of the cut tear found on the white shirt. The defect in the white shirt was examined and was determined to be a cut, not a tear. The defect in the sweat jacket was also determined to have been a cut.

{¶30} Julie Cox ("Cox") was a forensic scientist for BCII that testified next. After numerous questions concerning her qualifications, the trial court declared Cox to be an expert in the field of forensic biology. Cox testified that she took the blood samples from the submissions, determined that they were blood, and prepared them for DNA sampling. Cox testified that she took samples from the knife, the camouflage shirt, and a pair of jeans belonging to Staci. The samples were identified as blood and sent on for DNA testing. In addition, Cox had four DNA reference samples, one each from Staci, Hayes, Armbruster, and Seifert. The results were that Cox found no identified blood on the knife. The camouflage

shirt, the jacket, and the jeans tested positive for the presence of blood. Those samples were forwarded for DNA testing. Cox testified that although a knife is used to stab a person, it may not have blood on it if it is removed quickly before the blood has time to deposit.

{¶31} The final witness to testify during the State's case-in-chief was Erica Jimenez ("Jimenez"), who is also a forensic scientist in the DNA unit for BCII. The trial court determined that Jimenez was qualified to be an expert witness in the field of DNA analysis and comparisons. Jimenez testified that in assault cases, law enforcement may submit up to five items for initial analysis. If there is not a probative result, additional items may be submitted. Jimenez testified that the first item examined was the knife and they took DNA from the handle of the knife and from the blade of the knife. From the blade of the knife, the DNA was a mixture of DNA consistent with both Armbruster and Hayes. The sample from the handle of the knife was consistent with the DNA of Hayes. The blood sample from the shirt was consistent with the DNA of Armbruster. The samples from the collar of the shirt were consistent with DNA from Armbruster along with DNA from Staci. As for the jacket, the presumptive blood stain was consistent with that of Hayes. The blood found on Hayes' jeans was consistent with that of Hayes. The last item was the sample taken from Staci's jeans. That blood stain was consistent with that of Armbruster.

{¶32} On cross-examination, Jimenez testified that they do not test all the blood on any item, just limited pieces. She also testified that they would not take additional samples unless requested to do so by the detective. Jimenez testified that no samples were submitted from shoes, hats, of Hayes' hands. With DNA, they cannot say who the DNA belongs to conclusively, but rather who may not be excluded as the source.

{¶33} Following the testimony of its seventeen witnesses, the State rested. All 79 exhibits of the State were admitted without objection. Hayes then presented his defense. The first witness for Hayes was Robby Baker ("Baker"). Baker testified that on the night of the incident, he and his wife went with Hayes and Staci to Three Oaks. He and his wife left the bar around 1:30 a.m. Hayes and Staci left before he did. When Baker and his wife went to leave, he realized that Staci had left her coat, so he took it with them to return to Staci later. As they were leaving, Baker saw a car pulled over by law enforcement nearby. They then left. The next day Hayes came to his house to get the coat and they discussed the car accident. On cross-examination, Baker testified that he had been parked out front. He also testified that Staci was very intoxicated that night.

{¶34} The second and final witness for Hayes was Staci. Staci testified that she and Hayes arrived at Three Oaks around 9:00 or 9:30 p.m. She admitted that there was an incident where she was behaving inappropriately that Hayes had seen. According to Staci, Hayes was not angry, but joking and they were having a good time. When they left the bar, Baker walked them to the back door and she and Hayes left. When they were walking to the car, Hayes gave her the keys for her to drive. When they were six to eight feet away from the car, three men "came

around from the left and started punching and hitting on my husband, knocked him to the ground." Staci testified that the men were kicking and punching Hayes while he was on the ground. Staci then attempted to pull one of the men off of him, but the man grabbed a hold of her and "slammed" her to the ground. When she got back up, Staci saw them still attacking Hayes, so she again tried to pull one of the men off of Hayes. Again, she was thrown to the ground. Then, the three men just quit striking Hayes, turned and walked away. Staci then helped Hayes into the passenger seat of the car, and they left to go home. Within 10 minutes, they were struck head on by another car. The police arrived, asked questions, and called an ambulance to take Staci to the hospital. At the hospital, she spoke to Craig. Although Staci was not able to speak to Hayes at the hospital, she knew that he was being treated and that Craig was talking to him as well. Staci testified that at no point in the evening was Hayes angry with her. Staci also testified that when they went to the police station later, they attempted to make a report of being attacked outside the bar, but were told there was no one available at that time. Staci testified that Hayes did not stab anyone and that she did not see anyone being stabbed in the parking lot.

{¶35} On cross-examination Staci admitted that she had consumed one or two drinks right after work. She also had one beer at dinner and multiple drinks at Three Oaks. Staci also admitted that she could not describe any of the attackers and that she did not run inside the bar to ask for help. As to the photo line-up, Staci admitted that she did not return Craig's calls to schedule one. Staci explained this on redirect by testifying that since her husband was their suspect, she did not want to work with the police.

{¶36} Following Staci's testimony, Hayes rested his case. The State chose not to put on any rebuttal witnesses. On February 28, 2013, the jury returned verdicts of guilty on both counts. The trial court accepted and journalized the verdicts on February 28, 2013. The first sentencing hearing was held on April 18, 2013, but was continued to resolve an issue with restitution. A second sentencing hearing was held on April 26, 2013, but the issue of restitution remained unresolved, so the hearing was again continued. The final sentencing hearing was held on May 24, 2013. Following the hearing, the trial court sentenced Hayes to seven years in prison on count one and five years in prison on count two, with the sentences to run concurrently. The trial court also ordered Hayes to pay restitution in the amount of $6,633.12. Hayes filed his timely notice of appeal on May 28, 2013.

(Doc. 8-1, Ex. 9 at 2-26) (internal cites, statutes, and footnotes omitted).

## PROCEDURAL HISTORY

Respondent accurately summarized the procedural history; therefore, it is incorporated herein with only minor changes. (Doc. 8, at 3-7).

11

State Court Conviction

On September 12, 2012, a Seneca County Grand Jury indicted Petitioner on two counts of felonious assault. (Doc. 8-1, Ex. 1). Petitioner, through counsel, entered a plea of not guilty on all counts, and the case was set for trial.

After the jury trial, Petitioner was found guilty of two counts of felonious assault. (Doc. 8-1, Exs. 3, 4). On May 24, 2013, Petitioner was ordered to serve a total of seven years. (Doc. 8-1, Ex. 5).

Direct Appeal

Petitioner, through different counsel, filed a timely appeal to the Third District Court of Appeals, Seneca County, Ohio. (Doc. 8-1, Ex. 6). In his brief, Petitioner set forth the following assignments of error:

1. The defendant's conviction was not supported by the manifest weight of the evidence.

2. The counsel for the defendant provided ineffective assistance of counsel.

(Doc. 8-1, Ex. 7). On January 27, 2014, the Court of Appeals affirmed the judgment of the trial court. (Doc. 8-1, Ex. 9).

Petitioner, *pro se*, filed an appeal to the Ohio Supreme Court. (Doc. 8-1, Ex. 10). In his memorandum in support of jurisdiction, he asserted the following propositions of law:

1. Appellant's convictions were not supported by the manifest weight of the evidence.

2. Trial counsel was ineffective for failing to offer the defense of self-defense.

(Doc. 8-1, Ex. 11).[1] The State filed a memorandum opposing jurisdiction. (Doc. 8-1, Ex. 12). On May 28, 2014, the Ohio Supreme Court declined to accept jurisdiction and dismissed the appeal. (Doc. 8-1, Ex. 13).

<u>Petition to Vacate or Set Aside Conviction or Sentence</u>

On March 6, 2014, Petitioner, *pro se*, filed a petition to vacate or set aside his judgment of conviction or sentence and requested an evidentiary hearing with the Seneca County Court of Common Pleas. (Doc. 8-1, Ex. 14). He alleged his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when 1) critical evidence was not presented and 2) that he suffered due process violations when standard investigative protocols were not followed by police. *Id.* The State filed a response to the petition for post-conviction relief. (Doc. 8-1, Ex. 15). On March 18, 2014, the trial court denied the petition. (Doc. 8-1, Ex. 16). The record does not indicate that any appeal was taken from the decision of the court of common pleas.

<u>26(B) Application to Reopen Appeal</u>

On May 5, 2014, Hayes, *pro se*, filed an application to reopen his appeal. (Doc. 8-1, Ex. 17).[2] Petitioner raised the following assignments of error:

1. Trial court erred in not determining allied offenses of similar import prior to sentencing.

2. Trial court erred in imposing restitution outside of statute.

*Id.* On June 16, 2014, the court of appeals denied Petitioner's application to reopen his appeal. (Doc. 8-1, Ex. 18). The state court of appeals held both that the application was untimely without

---

1. This document is of poor quality and largely illegible. Respondent notified the court of this fact and stated that if Petitioner had a clearer copy he should produce it. Petitioner did not do so. Respondent also stated that the copy available on the Ohio Supreme Court's online docket is of only slightly better quality. Because the assignments of error are legible, and for the reasons addressed below, a clearer copy is unnecessary.
2. Exhibit 17 is also illegible in places, but it is possible to see the errors Petitioner alleged.

13

good cause and that the two additional assignments of error in the application did not set forth a genuine issue as whether Petitioner was denied effective assistance of counsel on appeal. *Id.* Petitioner did not appeal this judgment to the Ohio Supreme Court.

## FEDERAL HABEAS CORPUS

On January 26, 2015, Petitioner, *pro se*, filed the instant Petitioner for a writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). The writ raises the following grounds for relief:

> **GROUND ONE:** Trial counsel rendered ineffective assistance of counsel guaranteed by the United States and the Ohio constitution denying Petitioner his right to equal protection of the law and due process and to be free from double jeopardy.

> **GROUND TWO:** Trial court erred in imposing restitution outside of statute denying Petitioner his right to due process and equal protection of the law.

> **GROUND THREE:** Petitioner's convictions were not supported by the manifest weight of the evidence denying Petitioner his right to equal protection of the law and his right to due process of law.

(Doc. 1). Petitioner attached memoranda in support of each of his grounds for relief.

## JURISDICTIONAL ISSUES

Non-Cognizable Claims

*Ground Two*

In his second ground for relief, Petitioner asserts the trial court committed error when it imposed restitution, denying him equal protection and due process. (Doc. 1, at 18).

Generally, "fines or restitution orders fall outside the scope of the federal habeas statute because they do not satisfy the 'in custody' requirement of a cognizable habeas claim." *Washington v. McQuiggin*, 529 Fed. Appx. 766, 773 (6th Cir. 2013). Importantly, "'collateral relief from a noncustodial punishment, such as a fine or restitution order, is not made readily

available to a defendant just because he happens at that time to also be subject to custodial penalties.'" *Id.* (citation omitted). Petitioner's second ground for relief is non-cognizable.

*Ground Three*

In his third ground for relief, Petitioner asserts his "convictions were not supported by the manifest weight of the evidence, denying Petitioner his right to equal protection and due process of the law." (Doc. 1, at 20).

This claim would require the Court to perform tasks such as re-weighing the evidence or credibility of parties involved, a task for which it has no authority. *See Franklin v. Hudson*, 2009 U.S. Dist. LEXIS 40535 (N.D. Ohio); *Little v. Brunsman*, 2014 U.S. Dist. LEXIS 122948 (N.D. Ohio); *Steele v. Tambi*, 2007 U.S. Dist. LEXIS 33318, *38 (N.D. Ohio) ("[A] federal habeas court expressly may **not** undertake to weigh evidence, resolve conflicts in testimony, or otherwise make its own determination of guilt or innocence.") (emphasis in original). A manifest weight of the evidence claim raises only an issue of state law and does not rise to the level of a federal constitutional violation. *Morris v. Hudson*, 2007 U.S. Dist. LEXIS 88164, * 6 (N.D. Ohio). The undersigned recommends the Court dismiss the third ground for relief as non-cognizable.

Procedural Default

Procedural default occurs when a petitioner fails to fairly present his claims in a federal constitutional context to the highest state court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). Federalism and comity generally bar federal habeas corpus review of "contentions of federal law . . . *not* resolved on the merits in the state proceeding due to [the petitioner's] failure to raise them there as required by state procedure."

*Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) (emphasis in original); *see also Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006).

A petitioner may fail to obtain consideration of a claim by a state court by either: (1) failing to fairly raise it before the state court while state remedies are still available, or (2) failing to comply with a state procedural rule which prevents the state court from reaching the merits of the claim. *Wainwright*, 433 U.S. at 80, 84-87. In either scenario, the claim is procedurally defaulted and may not be considered by the federal court on habeas review. *Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000).

When, as here, there is noncompliance with a state procedural rule, the court conducts a four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether it may be excused:

1. Whether there is a procedural rule applicable to the claim at issue, and whether the petitioner in fact failed to follow it;

2. Whether the state courts actually enforced their procedural sanction;

3. Whether the state's procedural forfeit is an "adequate and independent ground" on which the state can rely to foreclose federal review; and

4. Finally, in order to avoid default, the petitioner can demonstrate that there was "cause" for him to neglect the procedural rule, and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

Demonstrating "cause" requires a petitioner to "show that 'some objective factor external to the defense' prevented the petitioner's compliance with a state procedural rule." *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Demonstrating prejudice requires him to show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage,

infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

A procedural default will also be excused if the petitioner demonstrates that not excusing the default "will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The Supreme Court has held that such an inquiry requires a petitioner "supplement[] his constitutional claim with a colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)). Maintaining this exception to the rule against reviewing procedurally defaulted claims serves as "an additional safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty." *Stone v. Powell*, 428 U.S. 465, 492–93, n.31 (1976)).

*Ground One*

In his first ground for relief, Petitioner argued to the court of appeals that his trial counsel was constitutionally ineffective because of both the failure to have other items tested and because of a failure to raise the defense of self-defense; the only ground presented to the Ohio Supreme Court was failure to raise the issue of self-defense. Thus, the ground premised upon failure to have other items tested in ground one is procedurally defaulted and should be denied. *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (noting a petitioner must present his claims to the highest state court within the proper time frame, in accordance with state rules, or else his claim will be procedurally defaulted).

*Ground Two*

Embedded within Petitioner's memorandum in support of ground two is an additional claim of ineffective assistance of *appellate* counsel; this claim is likewise procedurally defaulted.

Petitioner's assertion is procedurally defaulted because the Third District Court of Appeals determined Petitioner's application to reopen the appeal pursuant to Ohio Appellate Rule 26(B) was not filed within the ninety days of the appellate judgment as required by Ohio Appellate Rule 26(B)(1). Additionally, Petitioner has not offered any explanation to this court to excuse procedural default of this claim. *See Coleman v. Mitchell, 244 F.3d 533, 540* (6th Cir. 2001) ("When a habeas petitioner has failed to show cause for not asserting his ineffective assistance of appellate counsel claim properly in the Ohio courts, a federal court may not reach the merits of the habeas claim unless the petitioner can show that refusal to consider his claim would result in a fundamental miscarriage of justice."). Petitioner has not shown this, therefore, subpart of ground two is procedurally defaulted.

Thus, further analysis is only required of a portion of ground one—whether trial counsel was ineffective for failure to raise the defense of self-defense.

### STANDARD OF REVIEW

When the basis for a federal habeas claim has been previously adjudicated by the state courts, AEDPA provides the writ shall not issue unless the state decision "was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A federal court may grant habeas relief if the state court arrives at a decision opposite to that reached by the Supreme Court of the United States on a question of law, or if the state court decides a case differently than did the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Williams*, 529 U.S. at 409–11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

State trial court factual determinations are presumed correct and a petitioner must present clear and convincing evidence to the contrary in order to overcome the correctness presumption. 28 U.S.C. § 2254(e). "It is a clearly established rule that errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in federal habeas corpus proceedings." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).

**DISCUSSION**

*Ground One*

The remaining ground for relief is a portion of the first—ineffective assistance of *trial* counsel for failing to raise the defense of self-defense. Effective assistance of trial counsel is guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 685 (1984). To prevail on an ineffective assistance of counsel claim, a petitioner must satisfy both prongs of the test set forth in *Strickland*: that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and unreliable. *Strickland*, 466

U.S. at 698; *Harries v. Bell*, 417 F.3d 631, 636 (6th Cir. 2005) (citing *Strickland*, 466 U.S. at 686–692).

To meet the deficient performance prong, counsel's representation must fall below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 688. To meet the prejudice prong, there must exist a reasonable probability that, absent counsel's unprofessional errors, the results of the proceeding would have been different. *Id.*, at 694. When considering the prejudice element, the focus is on whether counsel's errors undermined the reliability of and confidence in the result. *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 370 (1993)). This is a high burden:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689.

Review of a *Strickland* claim is doubly deferential in a § 2254 proceeding. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam) ("Judicial review of a defense attorney[] . . . is . . . highly deferential – and doubly deferential when conducted through the lens of federal habeas."). This double deference arises because the *Strickland* standard is a general standard, giving a state court even more latitude to reasonably determine that a defendant has not satisfied the standard. *Knowles v. Mirzayance*, 556 U.S. 11, 123 (2009). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard

20

itself." *Richter*, 131 S. Ct. at 785. Accordingly, the pivotal question in any § 2254 action that presents an ineffective assistance claim, is "whether the state court's application of the *Strickland* standard was unreasonable." *Id.*, at 785.

Here, the Third District Court of Appeals overruled Petitioner's ineffective assistance claim as follows:

{¶41} In the second assignment of error, Hayes claims that his trial counsel was ineffective.

> In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done." *State v. Hester* (1976), 45 Ohio St.2d 71, 74 O.O.2d 156, 341 N.E.2d 304, paragraph four of the syllabus. When making that determination, a two-step process is usually employed. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." State v. Lytle (1976), 48 Ohio St.2d 391, 396-397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.
>
> On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent. See Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 31 0.0.2d 567, 209 N.E.2d 164; ** 915 State v. Jackson, 64 Ohio St.2d at 110-111, 18 O.O.3d at 351, 413 N.E.2d at 822.

*State v. Calhoun,* 86 Ohio St.3d 279, 289, 1999-Ohio-102, 714 N.E.2d 905.

> "Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel. To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (Citation omitted.)

*State v. Sallie,* 81 Ohio St.3d 673, 674, 693 N.E.2d 267 (1998).

{¶42} In support of his argument, Hayes claims that his counsel was ineffective for 1) failing to have other items of evidence tested and 2) for failing to raise the affirmative defense of self-defense. An attorney's determination of what evidence to present at trial is a matter of trial strategy. *State v. Hester,* 10th Dist. Franklin No. 02AP-401, 2002-Ohio-6966.

* * *

{¶43} Hayes also claims that counsel was ineffective for failing to raise a claim of self-defense. When a claim of self-defense conflicts with the defense presented, it is sound trial strategy not to raise a claim of self-defense. *State v. Marshall,* 175 Ohio App.3d 488, 2008-Ohio-955, ¶86, 887 N.E.2d 1227 (1st Dist.). In this case, Hayes claimed, through his statements to the police and the testimony of Staci, that the events did not happen. Hayes claimed that he was attacked in the parking lot by three men, but that he never pulled out his knife or stabbed anyone. This argument would have been contradictory to an argument that there was a fight, but the aggressor was Seifert and Armbruster, so he stabbed them to protect himself or Staci. Thus, the decision not to request an instruction on self-defense was a matter of trial strategy.

{¶44} Since trial counsel did not err by not requesting additional testing and not raising self-defense as an affirmative defense, there was no violation of counsel's duties. The first prong of the test is not met. In addition, appellate counsel has not presented any evidence to indicate that the outcome would have been different if trial counsel had done the above. Thus, the second prong of the test is also not met. The second assignment of error is overruled.

The undersigned finds the court of appeals' application of the *Strickland* test reasonable and it is entitled to deference; therefore, Petitioner's ineffective assistance assertion is without merit. Petitioner has not met his burden to overcome the presumption that the decision to not raise a self-defense claim was nothing more than trial strategy. This portion of Petitioner's first ground for relief should also be dismissed.

Further, as Petitioner has not established cause, the Court need not address whether prejudice existed. *Murray*, 477 U.S. at 494-95.

The only other avenue to excuse procedural default requires a finding of "actual innocence" in which the "petitioner [must] support his allegations of constitutional error with new reliable evidence…that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324

22

(1995). Petitioner has not presented the existence of reliable new evidence that would establish "factual innocence".

### CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the undersigned recommends the Petition be denied.

s/James R. Knepp, II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).